IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CURTIS C., individually and on behalf of R.C., a minor <br><br> *Plaintiffs*, <br><br> v. <br><br> HEALTH CARE SERVICE CORPORATION d/b/a Blue Cross Blue Shield of Texas <br><br> *Defendant*. | No. 25 C 884 <br><br> Chief Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Curtis C. and his minor child, R.C., filed a Complaint against Defendant Health Care Service Corporation d/b/a Blue Cross Blue Shield of Texas ("HCSC") on January 27, 2025. (Dkt. 1). They allege that HCSCS denied coverage benefits for medical care and treatment that R.C. received at Dragonfly Transitions ("Dragonfly") in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), and that HCSC's policy of denying coverage for this kind of care violates the Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act"). (*See id.* ¶ 8). HCSC now moves to dismiss both Plaintiffs' ERISA and Parity Act claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 15). HCSC's motion to dismiss [15] is denied.

## BACKGROUND

Curtis, a resident of Texas, was a participant in an HCSC employee benefits plan and R.C., his minor child, was a covered beneficiary. (Dkt. 1 ¶ 3). In January 2022, R.C. was admitted to Dragonfly in Klamath Falls, Oregon. (*Id.* ¶¶ 4, 9). Dragonfly was a licensed in-patient treatment

1

program for adolescents suffering from mental health, behavioral health, and substance abuse problems. (*Id.* ¶ 4). R.C. remained at Dragonfly for approximately nine months, and incurred medical expenses that exceeded $420,000. (*Id.* ¶ 35).

Dragonfly submitted claims directly to HCSC for payment. On April 11, 2023, HCSC submitted a letter to the Texas Department of Insurance stating that the claims for R.C.'s care at Dragonfly were denied because the facility that submitted the claims was not a covered "residential treatment center" ("RTC") but instead was licensed to "care for the homeless, runaways, and . . . to operate as a transitional living shelter." (*Id.* ¶ 10). HCSC also noted that the coverage denial was due to a lack of prior authorization. (*Id.*) Curtis also received an "Explanation of Benefits statement that simply noted "[t]his service is excluded under your Health Care Plan. Please refer to your benefit booklet for specific coverage information and exclusions under your contract." (*Id.* ¶ 11).

Curtis appealed the denial of payment for R.C.'s care on December 7, 2023. (*Id.* ¶ 12). He acknowledged that his benefits plan excluded certain behavioral health facilities, like "military schools" and "wilderness programs" but argued that Dragonfly was both *not* an excluded facility and met the definition of an "appropriate provider" as specified in the plan. (*Id.* ¶¶ 16–18). Further, Curtis reminded HCSC that it had an obligation to conduct a "full, fair, and thorough review conducted by appropriately qualified reviewers" and that he believed HCSC was imposing limitations on mental health facility and provider services that were not imposed in analogous medical and surgical care scenarios in violation of the Parity Act. (*Id.* ¶¶ 13–14, 19–22).

HCSC denied Curtis's appeal on March 21, 2024. (*Id.* ¶ 27). It stated that the claims were appropriately denied in the first place because Dragonfly was not an RTC but "supervised living," which Curtis's plan did not cover. (*Id.* ¶ 27). This served as a final denial letter, and HCSC did not

2

substantively respond to any of Curtis's subsequent communications. (*Id.* ¶ 33).

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The factual allegations "must be enough to raise a right to relief above the speculative level." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555). At the 12(b)(6) stage, the Court construes the complaint in the light most favorable to the nonmoving party, accepts all well-pleaded facts as true, and draws all inferences in his favor. *Heyde v. Pittenger*, 633 F.3d 512, 516 (7th Cir. 2011).

## DISCUSSION

### I. Count I: Improper Denial of Benefits

Based on the plan's language, HCSC's primary argument is that Dragonfly is a "supervised living" facility, which is expressly excluded from the definition of an RTC, mandating dismissal of Plaintiffs' Complaint. (*See, e.g.*, Dkt. 16 at 5–6).

To fully understand HCSC's argument, it is necessary to review some of the pivotal plan language governing this dispute. First, Curtis's plan includes a "Covered Medical Services" section that explains the scope of coverage for mental health services. (*See* Ex. A-1, Dkt. 16-1 at 56 (hereinafter "Plan")).[1] That section states "Benefits for Eligible Expenses incurred for the treatment of Mental Health Care are shown on your Schedule of Coverage." (*Id.*) It further provides that "Medically Necessary services for Mental Health Care in a . . . Residential Treatment

---

[1] Pincites to the plan refer to the corresponding page of Dkt. 16-1, stamped at the top and out of 163 total, not to internal pagination located at the bottom of each page.

3

Center for Children and Adolescents . . . will be considered Inpatient Hospital Expense." (*Id.*)

The Schedule of Coverage, in turn, contains a list of mental health care benefits. It states in-patient hospital services are reimbursable up to certain amounts on a facility-wide basis. (*Id.* at 11). Based on the information provided in the plan's Covered Medical Services this would seem to include services rendered at an RTC. (*Id.* at 56). Apart from hospital services, "Behavioral Health Practitioner services" are listed as covered benefits on both an in-patient and out-patient basis. (*Id.* at 11).

Finally, there are three relevant plan definitions:

(1) "**Behavioral Health Practitioner** means a Physician or Professional Other Provider who renders services for Mental Health Care, Serious Mental Illness or Chemical Dependency." (Plan at 81).

(2) "**Professional Other Provider**" means a "a person or practitioner, when acting within the scope of his license and" who has an appropriate certification, including "Licensed Professional Counselor[s]" and "Licensed Clinical Social Worker[s]." (*Id.* at 92–93).

(3) "**Residential Treatment Center** means a facility setting . . . offering a defined course of therapeutic intervention and special programming in a controlled environment which also offers a degree of security, supervision, structure and is licensed by the appropriate state and local authority to provide such service. *It does not include* half-way houses, wilderness programs, *supervised living*, group homes, boarding houses *or other facilities that provide primarily a supportive environment and address long-term social needs, even if counseling is provided in such facilities*." (*Id.* at 95 (emphasis added)).

"[B]enefits payable under an ERISA plan are limited to the benefits specified in the plan." *Clair v. Harris Tr. & Sav. Bank*, 190 F.3d 495, 497 (7th Cir. 1999). Courts apply general principles

4

of contract law to interpret insurance policies under ERISA, and construe all ambiguities in favor of the insured. *Cheney v. Standard Ins. Co.*, 831 F.3d 445, 450 (7th Cir. 2016). To withstand a motion to dismiss, an ERISA plaintiff must identify a specific plan term conferring a benefit and "provide the court with enough factual information to determine whether the services were indeed covered services under the plan." *LB Surgery Ctr., LLC v. United Parcel Serv. of Am., Inc.*, 2017 WL 5462180, at *2 (N.D. Ill. Nov. 14, 2017) (citation modified).

HCSC spills significant ink on the issue of whether Dragonfly is an RTC under the plan's terms. (*See* Dkt. 16 at 5–7). But very little is required here, as Plaintiffs readily concede that Dragonfly is not an RTC. (Dkt. 20 at 14). The operative question, then, is whether any other plan provisions could plausibly cover all or part of Dragonfly's services.

Plaintiffs point to language throughout the plan that provides for the reimbursement of expenses incurred in receiving Mental Health Care from a Behavioral Health Practitioner. (*See* Dkt. 20 at 13). As outlined above, the Schedule of Coverage for mental health services includes two kinds of reimbursable, in-patient-mental-health services: "Hospital services (facility)" and "Behavioral Health Practitioner services." (Plan at 11). And Plaintiffs allege that, while at Dragonfly, the majority of R.C.'s progress notes were signed by Dragonfly's clinical director, Anthony Liufau, who is a Licensed Professional Counselor and, therefore, a "Behavioral Health Practitioner" under the plan. (Dkt. 20 at 13). R.C. also received services from other Behavioral Health Practitioners who worked at Dragonfly, namely Kelly Elliott and Mona Treadway, both of whom are Licensed Clinical Social Workers. (*Id.* at 13 n.13). Accordingly, Plaintiffs contend that because inpatient Behavioral Health Practitioner services are included in the schedule of coverage, "it should be without dispute that R.C.'s treatment at Dragonfly meets the terms of the plan." (*Id.* at 13).

HCSC responds that, regardless of whether R.C. received some services from Behavioral Health Practitioners, none of the Dragonfly expenses are eligible because they were all billed under a supervised living code by the facility itself, not the provider. (*See* Dkt. 31 at 3–4). In other words, it is HCSC's position that that ordinarily reimbursable Behavioral Health Practitioner services transform into nonreimbursable expenses when provided at a supervised living facility like Dragonfly and when the facility bills the plan administrator using their supervised living billing code. For example, HCSC states:

> Had one of the purported Behavioral Health Practitioners that Plaintiffs highlight in their Opposition, including Anthony Liufau, LPC, Kelly Elliott, and Mona Treadway, submitted bills for individual, group, family, or conjoint psychotherapy, counseling, psychoanalysis, psychological testing and assessment, administration or monitoring of drugs, or a consultations at a facility, such services would likely have been eligible for coverage under the Plan.

(Dkt. 31 at 5 n.5; *see also* Dkt. 31 at 1).

HCSC's argument is unavailing. The Court has not identified any provision in the plan—nor has HCSC pointed to one—that establishes reimbursement eligibility is determined by how services are billed. To the contrary, courts have easily concluded that it is "not the billing codes that determine eligibility for coverage, but the Plan language and the governing statutes that are read into it." *Jingmen, Inc. v. Aetna Life Ins. Co.*, 2004 WL 3119030, at *6 (S.D. Fla. May 11, 2004). Even assuming Dragonfly as a facility is not covered under the plan, it is at least plausible based on the language to which Plaintiffs have pointed that some portion of the services Dragonfly provided to R.C. should have been covered, regardless of how they were billed or where they were tendered. To that end, HCSC's focus on Dragonfly's billing for room and board is beside the point. (Dkt. 31 at 3). For even if those expenses are nonreimbursable, it does not follow that all other services—including necessary mental health services rendered by qualified Behavioral Health Practitioners—are similarly nonreimbursable. Indeed, a court in this district that recently

considered a factually similar case came to the same conclusion. *See Brian W. v. Health Care Serv. Corp.*, 2025 WL 306365, at *3 (N.D. Ill. Jan. 27, 2025) (noting that, even assuming a facility was not an RTC, a plaintiff plausibly alleged that services received at that facility were covered under the plan because a "Professional Other Provider" provided those services.).

The calculus here may have been different if this case was before the Court on a Motion for Summary Judgment, *see, e.g.*, *Camelot Care Ctrs., Inc. v. Planters Lifesavers Co.*, 836 F. Supp. 545 (N.D. Ill. 1993), or following a bench trial, *see, e.g.*, *Samaritan Health Ctr. v. Simplicity Health Care Plan*, 516 F. Supp. 2d 939 (E.D. Wis. 2007). Whether Dragonfly's services are truly reimbursable will be further elucidated at a later stage of this litigation. For now, Plaintiffs have plausibly pled an improper denial of coverage based on specific language providing for reimbursement of inpatient Behavioral Health Practitioner services.

## II.     Count II: Parity Act Claim

The Court now turns to Plaintiffs' Parity Act claim. The Parity Act prohibits ERISA plans that provide for mental health and substance abuse benefits in addition to medical and surgical benefits from imposing treatment limitations on mental health services that are "more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan." 29 U.S.C. § 1185a(3)(A)(ii). Specifically, when a plan provides benefits within a certain classification, "it cannot impose more stringent limitations on a mental health benefit within the same classification" as a medical and surgical health benefit. *Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 827 (N.D. Ill. 2019). Nonetheless, the Parity Act does not call for identical treatment limitations; the "the processes, strategies, evidentiary standards, and other factors" must simply be "comparable" and "applied no more stringently." 29 C.F.R. § 2590.712(c)(4)(i).

While the Seventh Circuit has not yet addressed the pleading standard for a Parity Act violation, courts often follow a four-part test, whereby plaintiffs must plausibly allege "(1) the relevant group health plan is subject to the Parity Act; (2) the plan provides both medical/surgical benefits and mental health or substance use disorder benefits; (3) the plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than medical/surgical benefits; and (4) the mental health or substance use disorder benefit being limited is in the same classification as the medical/surgical benefit to which it is being compared." *Brian W.*, 2025 WL 306365, at *6. Only the third element is at issue here.

Plaintiffs contend there are several separate grounds upon which the Court could find a Parity Act violation. At bottom, though, they argue that the plan does not cover behavioral health conditions like R.C.'s at parity with analogous medical or surgical care within the same classification, including skilled nursing, subacute rehabilitation, and in-patient hospice facilities. (Dkt. 1 ¶ 19). HCSC denied Curtis's claim at least in part because Dragonfly was a facility providing a "a primarily supportive environment," and was therefore excluded from the definition of an RTC. (*See id.* ¶ 27; Plan at 95; Dkt. 16 at 10–11). It contends that the plan includes similar supportive-care exclusions for medical and surgical care benefits like skilled nursing facilities ("SNFs"), rendering Plaintiffs' Parity Act claim deficient. (Dkt. 16 at 10–11).

The parties agree that SNFs are "medical or surgical analogues to the treatment R.C. received." (Dkt. 1 ¶ 19; Dkt. 16 at 1). The plan defines SNFs as facilities "primarily engaged in providing skilled nursing services and other therapeutic services" that are both licensed under state law and Medicare or Medicaid eligible. (Plan at 96). HCSC contends that, like RTCs, SNFs are not covered under the plan when they are "custodial or supportive in nature." (Dkt 16 at 10). It points to the plan's "custodial care" exclusion for support, which provides in full:

8

> **Custodial Care** means any service primarily for personal comfort for convenience that provides general maintenance, preventive, and/or protective care without any clinical likelihood of improvement of your condition. Custodial Care Services also means those services which do not require the technical skills, professional training and clinical assessment ability of medical and/or nursing personnel in order to be safely and effectively performed. These services can be safely provided by trained or capable non-professional personnel, are to assist with routine medical needs (e.g. simple care and dressings, administration of routine medications, etc.) and are to assist with activities of daily living (e.g. bathing, eating, dressing, etc.).

(Plan at 83).

Contrary to HCSC's position, the RTC and SNF policy exclusions are notably different. For one, the "primarily supportive" clause is only "only relevant to behavioral health treatments" at RTCs. *C.W. v. Health Care Serv. Corp.*, 2025 WL 933847, at *4 (N.D. Ill. Mar. 27, 2025). As a result, the plan has "chosen to deny benefits to those with mental health conditions who seek coverage for a residential treatment center" that "provide primarily a supportive environment and address long-term social needs, even if counseling is provided in such facility." *Gallagher v. Empire HealthChoice Assurance, Inc.*, 339 F. Supp. 3d 248, 258 (S.D.N.Y. 2018); (Plan at 95). The custodial care exception is not comparably restrictive, leading to the potential for disparities in coverage between RTCs and SNFs within the same care classification. For example, the supportive-care exclusion applies regardless of whether a facility provides skilled counseling service while the custodial care clause only applies to facilities which "do not require the technical skills, professional training and clinical assessment ability of medical and/or nursing personnel." (Plan at 83, 95). Moreover, the first clause of the custodial care definition speaks to services that are primarily for "personal comfort" or "convenience" which could plausibly exclude far fewer facilities than those which are deemed primarily "supportive." (*Id.*). In short, the Court has no trouble conceiving of myriad facilities that could be classified as primarily supportive, but that still require trained professional staff to administer care, or that go beyond providing services that are

9

merely for personal comfort or convenience.

HCSC relies heavily on the decision in *Alice F.*, which considered similar plan language to that at issue here. That case, however, recognized that Parity Act decisions are "all over the map" due to the "varying language used in the respective plans." *Alice F. V. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 828 (N.D. Ill. Mar. 18, 2019). This case is no different. The plan in *Alice F.* included an SNF exclusion for facilities that provided "skilled or private duty nurses to assist in daily living activities, **routine supportive care** or to provide services for the convenience of the patient and/or his family members." *Alice F.*, 367 F. Supp. 3d at 829 (emphasis added). The RCT exclusion was the same as the one at issue in this case, i.e., no coverage for facilities that "provide primarily a supportive environment and address long term social needs." *Id.* at 825. Viewing these provisions side-by-side, the court concluded that both RTCs and SNFs excluded facilities that were "primarily supportive in nature," and no Parity Act violation existed. *Id.* at 829.

HCSC contends that Plaintiffs' plan contains nearly identical exclusionary language to that at issue in *Alice F.* (*See* Dkt. 16 at 10). It is half right. While the RCT language is the same, there are critical differences in the exclusions applying to SNFs. HCSC cites to pages 59 and 67 of the plan, and asserts that there is a "routine supportive care" exclusion for SNFs and in-patient hospice services. (*Id.*) But a thorough review of the plan uncovers no such language. Indeed, the word "supportive" appears only once in the plan: in the definition of Residential Treatment Center. (Plan at 95). Perhaps HCSC was misinformed about the specific language in the plan but, either way, the omission significantly limits *Alice F.*'s applicability to these facts and the Court is left with its initial comparison of the RCT definition and the Custodial Care Exception.

Accordingly, Plaintiffs have plausibly alleged that the "primarily supportive" policy exclusion that applies to RTCs violates the Parity Act. The Court declines to address Plaintiffs'

other bases for possible Parity Act violations. *See Brian W.*, 2025 WL 306365, at *8. HCSC's Motion to Dismiss Plaintiffs' Parity Act claim is denied.

## CONCLUSION

For the reasons set forth above, HCSC's Motion to Dismiss [15] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: December 18, 2025

11